IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| Green Ballast, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-2601 |
| | ) | |
| v. | ) | |
| | ) | |
| William H. Bethell, Individually, | ) | |
| GNAC, LLC, a Limited Liability | ) | |
| Company, Nick Bussanich, | ) | |
| Individually, Richard Comforto, | ) | |
| Individually, Brian Bowman, | ) | |
| Individually, and Various John | ) | |
| Does, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before the Court is Plaintiff Green Ballast, Inc.'s ("Green Ballast") Motion for Preliminary Injunction. Green Ballast filed a Complaint on August 5, 2013, against Defendants William H. Bethell, ("Bethell"), Nick Bussanich ("Bussanich"), GNAC, LLC, a Limited Liability Company ("GNAC"), and various John Does alleging claims for breach of contract, conspiracy, tortious interference with business relationships, tortious inducement or procurement of breach of contract pursuant to T.C.A. § 47-50-109, breach of fiduciary duty of a director or officer of a corporation pursuant to T.C.A. § 48-18-301, breach of duty of loyalty, and defamation. (Compl., ECF No. 1). Green Ballast

filed a Motion for Temporary Restraining Order on August 5, 2013. (Mot. Temp. Rest. Ord., ECF No. 6). Green Ballast asked the Court to enjoin Defendants Bethell, Bussanich, and GNAC from:

> calling on, speaking with, or otherwise communicating with, (A) any current, former or potential client of Green Ballast; (B) any current or former employee of Green Ballast; (C) any current, former or potential investor of Green Ballast; (D) any current, former or potential vendor of Green Ballast.

(Compl. at 10.) Defendants Bethell, Bussanich, and GNAC responded on August 9, 2013. (Resp., ECF No. 8.) Green Ballast amended its Complaint on August 20, 2013, adding Defendants Richard Comforto ("Comforto") and Brian Bowman ("Bowman"). (Am. Compl., ECF No. 17.) At the temporary injunction hearing on August 13, 2013, Green Ballast's Motion for Temporary Restraining Order was converted to a Motion for Preliminary Injunction. (Min. Entry, ECF No. 14.) The Court held an evidentiary hearing on August 13, 15, 22-23, and 28-30, 2013. Sixty-one exhibits were admitted. (Ex. List, ECF No. 29.) The Court heard the testimony of Kevin Adams, John Philip Jones, Kevin Blake Clarkson, Daniel Brown, Bethell, Bussanich, Comforto, Gary A. Seigel, and Michael Drake. (Id.) Plaintiffs and Defendants filed Proposed Findings of Fact and Conclusions of Law on September 4, 2013. (Green Ball. Prop. Findings, ECF No. 32; Def. Prop. Findings, ECF No. 33.) The parties responded

to each other's proposed findings on September 6, 2013. (Green Ball. Resp., ECF No. 35; Def. Resp., ECF No. 36.)

Green Ballast seeks a preliminary injunction against Defendants that:

> (1) prohibits [Defendants] from doing business with each other; (2) prohibits [Defendants] from doing business with current or former employees, vendors or independent contractors of Green Ballast; (3) prohibits Defendants from contacting, soliciting, diverting, appropriating or calling upon any current, former or future customer of Green Ballast for the purpose of providing building audit services or any other energy conservation measures; (4) prohibits Defendants from making any negative comments about Green Ballast to anyone other than their counsel; and (5) prohibits Defendants from interfering with Green Ballast's relationships with any supplier, manufacturer, service provider or other business relation of Green Ballast.

(Green Ball. Prop. Findings at 35.) For the following reasons, Green Ballast's Motion for Preliminary Injunction is GRANTED to the extent provided in this Order.

## I. Jurisdiction and Choice of Law

This Court has diversity jurisdiction under 28 U.S.C. § 1332. Green Ballast is a Delaware corporation with its principal place of business in Memphis, Tennessee. (Am. Compl. ¶ 1b.) Bethell is a resident of New York. (Id. ¶ 1c.) Bussanich is a resident of New Jersey. (Id. ¶ 1h.) Bowman is a resident of Nevada. (Id. ¶ 1j.) Comforto is a resident of New York. (Id. ¶ 1l.)

For purposes of determining diversity, limited liability companies "have the citizenship of each partner or member." V&M Star, LP v. Centimark Corp., 596 F.3d 354, 356 (6th Cir. 2010) (citing Delay v. Rosenthal Collins Group, LLC, 558 F.3d 1003, 1005 (6th Cir. 2009)). GNAC is a Delaware limited liability company with its principal place of business in New York. (Am. Compl. ¶ 1e.) Bethell, a New York resident, is GNAC's only member. (Id. ¶ 1f.) GNAC is a citizen of New York.

There is complete diversity.

Green Ballast has pled damages in excess of $75,000. (Id. ¶ 1a, 113.)

In diversity actions, a federal court applies the choice of law provisions of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Cole v. Mileti, 133 F.3d 433, 437 (6th Cir. 1998). The parties' disputes are based in contract, tort, and corporate law.

Tennessee follows the rule of lex loci contractus, which provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed, absent a contrary intent. Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999) (citing Ohio Cas. Ins. Co. v. Travelers Indem. Co., 493 S.W.2d 465, 467 (Tenn. 1973)). The contracts at issue provide that Tennessee law applies. (Bethell Agreement ¶ 16, Exh. 15; Bussanich Agreement ¶ 16, Exh. 16; Bethell Non-Comp. ¶

6, Exh. 45; Bethell Non-Discl. ¶ 16, Exh. 47; Bussanich Non-Comp. ¶ 6, Exh. 44; Bussanich Non-Discl. ¶ 16, Exh. 48; Bowman Non-Comp. ¶ 6, Exh. 46; Bowman Non-Discl. ¶ 16, Exh. 49.)[1]  A choice of law provision will be honored so long as the choice of law provision was executed in good faith, and there is no assertion that the choice of law provisions here were not. Messer Griesheim Indus. v. Cryotech of Kingsport, Inc., 131 S.W.3d 457, 474 (Tenn. Ct. App. 2003).  Tennessee law applies to the parties' contract disputes.

Tennessee applies the "most significant relationship" approach to tort disputes.  Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992).  That approach dictates that the "law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation."  Id.  The injury to Green Ballast occurred in Tennessee, Green Ballast's principal place of business.  The parties do not dispute that Tennessee law governing causes of action for conspiracy, tortious interference with business relationships, tortious inducement or procurement of breach of contract, and defamation applies in this case.  Tennessee law applies to the parties' tort disputes.

---

[1] A copy of Bowman's Agreement was not admitted at the preliminary injunction hearing and has not been provided to the Court.  Philip Jones, Green Ballast's general counsel, testified that Bowman entered into an Employment Agreement.  The relevant terms in Bowman's Agreement were the same as those in Bethell and Bussanich's Agreements.

Tennessee applies the "internal affairs" doctrine to determine the law governing the internal affairs of foreign corporations.  *In re Healthways, Inc. Derivative Litigation*, 2001 WL 882448, at *3 (Tenn. Ct. App. 2011) (internal citations and quotations omitted).  That doctrine requires a court to resolve disputes about the internal affairs of a corporation "in accordance with the law of the state of incorporation."  *Id.* (internal citations and quotations omitted).  Claims about the breach of an officer or director's fiduciary duty are within the scope of the internal affairs of a foreign corporation. *Bayberry Assocs. v. Jones*, 1988 WL 137181, at * 4 (Tenn. App. 1988) (citing *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir. 1985)).  Green Ballast was incorporated in Delaware. Delaware law applies to Green Ballast's breach of fiduciary duty and duty of loyalty claims.

## II.  Findings of Fact[2]

Green Ballast is a Delaware corporation with its principal place of business in Memphis, Tennessee.  Green Ballast sells daylight harvesting and addressable wireless programmable ballasts for fluorescent lighting fixtures.  (Green Ballast Priv. Place. Memo at 1, Ex. 17.)  Those ballasts conserve energy.  (Green Ball. Inv. Opp. at 1, Exh. 18; 3/31/13 10-Q Item

---

[2] The following findings of fact are made only for purposes of deciding the Motion for Preliminary Injunction.

2, Exh. 27.) Green Ballast is an "energy services company" ("ESCO"). (05/11/13 Bethell Email, Exh. 13; 11/24/12 Bethell Email, Exh. 55.) Gemini Strategies ("Gemini") sold assets and intellectual property to Green Ballast in exchange for a promissory note in the principal amount of $1,800,000.00 ("Gemini Note"). (3/31/13 Form 10-Q at 6, Exh. 27.)

Defendant Bethell became Green Ballast's Chief Financial Officer on April 15, 2011. Green Ballast's Board of Directors terminated Bethell as Chief Financial Officer and Treasurer for cause on June 28, 2013. (Bethell Term. Letter at 1, ECF No. 17-9.) Bethell was a member of Green Ballast's Board of Directors until August 2013.

Bussanich became Green Ballast's Vice President of Business Development on June 23, 2011. Bussanich's Employment Agreement provides that "the term of the [employee's] employment shall commence on the Effective Date [June 23, 2011] for the purposes of this Agreement and end on March 31, 2011 . . . . (Bussanich Agr. ¶ 3a, Exh. 16.)[3] Green Ballast did not renew Bussanich's Employment Agreement in 2012. (Term. Empl. Agr. Letter, Exh. 57.) Bussanich remained an at-will employee until he was terminated from Green Ballast July 23, 2013. (Bussanich Term. Letter, Exh. 30.)

---

[3] Although the end date is listed as March 31, 2011, that end date would be before the Effective Date. The Court understands this anomaly as a typographical error and reads the end date as March 31, 2012.

Bowman became Green Ballast's Vice President of Product Development on April 15, 2011. (Bowman Counter. ¶ 3.) Bowman resigned on July 16, 2013. (Bowman Resign. Letter, ECF No. 17-15.)

On June 23, 2011, Bethell, Bussanich, and Bowman signed Employment Agreements (the "Agreements"). (Bethell Agr., Exh. 14, 15; Bussanich Agr., Exh. 16.) The relevant provisions of the Agreements are identical in all material respects. The Agreements provide that "[t]he [employee] shall enter into the Confidentiality Agreement and Non-Compete Agreement. The [employee's] execution of those agreements is a material inducement for the Company to enter into this Agreement." (Id. ¶ 12.) The Confidentiality Agreement is "that certain Non-Disclosure and Proprietary Rights Agreement between Company and [employee] in substantially the form attached hereto as Exhibit A." (Id. ¶ 1.) The Non-Compete Agreement is "that certain Non-Compete Agreement between the Company and the [employee] in substantially the form attached hereto as Exhibit B." (Id.)

On June 23, 2011, Bethell, Bussanich, and Bowman signed Non-Competition Agreements (the "Non-Competes"). (Bethell Non-Comp., Exh. 45; Bussanich Non-Comp., Exh. 44; Bowman Non-Comp., Exh. 46.) All three Non-Competes provide that

> During the term of his . . . employment with the
> Company, Employee will not, directly or indirectly,
> participate in the management, operation, financing or

> control of, or be employed by or consult for or
> otherwise render services to, any individual or entity
> that competes with the Company in the Restricted Area
> in the conduct of the business of the Company as
> conducted or as proposed to be conducted, nor will
> Employee engage in any other activities that conflict
> with his . . . obligations to the Company.

(Bethell Non-Comp. ¶ 2; Bussanich Non-Comp. ¶ 2; Bowman Non-Comp. ¶ 2.) The Non-Competes forbid each of the Defendants to participate directly or indirectly in the "management, operation, financing or control of, or be employed by or consult for or otherwise render services to, any Conflicting Organization in the Restricted Area in connection with or relating to the [] Conflicting Product," for one year after the date that employment with Green Ballast ends for any reason. (Id.) The "Restricted Area" is the United States. (Id. ¶ 1d.) A "Conflicting Organization" is "any individual or entity that, directly or indirectly, engages in, or is about to become engaged in, the development, design, production, manufacture, promotion, marketing, sale, support or service of a Conflicting Product." (Id. ¶ 1a.) "Conflicting Products" are:

> lighting ballasts or product, goods, products, product
> lines or services, and each and every component
> thereof, developed, designed, produced, manufactured,
> marketed, promoted, sold, supported or serviced, or
> that are in development or the subject of research, by
> anyone other than the Company that are the same as or
> similar to, perform any of the same or similar
> functions as, may be substituted for, or are intended
> or used for any of the same purposes as, a Company
> Product.

(Id. ¶ 1b.)  A "Company Product" means any lighting ballasts or other product, good, product line, or service:

> (i) that during the last one (1) year in which Employee was employed by the Company, Employee . . . performed research regarding, designed, developed, produced, manufactured, promoted, sold, solicited sales of, supported or serviced on behalf of the Company, or (ii) with respect to which Employee at any time received or otherwise obtained or learned Confidential Information.

(Id. ¶ 1c.)

Each Non-Compete also provides that breach of the Non-Compete will "cause the Company irreparable damage for which monetary damages alone would be inadequate compensation" so that the Company will be entitled to "an injunction and other equitable relief . . . in the event of any breach or threatened breach . . . of the provisions of this Agreement."  (Id. ¶ 5.) Defendants Bethell, Bussanich, and Bowman agreed to consent to the granting of injunctive relief if they breached their Non-Competes.  (Id.)

On June 23, 2011, Bethell, Bussanich, and Bowman also signed Non-Disclosure and Proprietary Rights Agreements (the "Non-Disclosures").  (Bethell Non-Discl., Exh. 47; Bussanich Non-Discl., Exh. 48; Bowman Non-Discl., Exh. 49)  All three Non-Disclosures prohibit an employee from disclosing, communicating, publishing, transmitting, or using Confidential Information.

(Bethell Non-Discl. ¶ 2; Bussanich Non-Discl. ¶ 2; Bowman Non-Discl. ¶ 2.) "Confidential Information," as defined:

> means, but is not limited to, all information that is possessed by or developed for the Company and which relates to the Company's existing or potential business, which information is not reasonably knowable by the Company's competitors or by the general public through lawful means. . . . [S]uch Confidential Information also includes . . . all information regarding the Company's operations, research and development efforts, plans for products or services, methods of doing business, business strategies, customers, suppliers, service providers, manufacturers, business relations, product prices and costs, markets, marketing plans, budgets and forecasts, financial information and/or Inventions, as well as information regarding the skills, know how and compensation of employees of the Company.

(Id.) Each Non-Disclosure contains a non-competition paragraph that is identical to the one contained in Paragraph 2 of the Non-Competes. (Bethell Non-Discl. ¶ 11; Bussanich Non-Discl. ¶ 11; Bowman Non-Discl. ¶ 11.) The Non-Disclosures contain a non-solicitation section that prohibits an employee from directly or indirectly attempting to

> (a) hire, engage or solicit to hire or engage any individual who is engaged as a contractor or consultant or employed by the Company or who was engaged as a contractor or consultant or employed by the Company within six months of the proposed solicitation, hire or engagement[;] (b) otherwise induce or attempt to induce an individual who is engaged as a contractor or consultant or employed by the Company to terminate such engagement or employment[;] (c) in any way interfere with the relationships between the Company and any individual who is engaged as a contractor or consultant or employed by the Company; (d) contact, solicit, divert, appropriate or call upon with the intent of doing

> business with . . . any customer of the Company if the
> purpose of such activity is to solicit such customer
> or prospective customer for a Competing Business, to
> encourage such customer to discontinue, reduce or
> adversely alter the amount of such customer's business
> with the Company or to otherwise interfere with the
> Company's relationship with such customer[;] or (e) in
> any way interfere with the Company's relationship with
> any supplier, manufacturer, service provider or other
> business relation of the Company.

(Id. ¶ 12.) That clause is effective during the three

Defendants' employment with Green Ballast and for one year after

the date that employment ends for any reason. (Id.)

The Non-Disclosures also provide that breach will "cause

the Company irreparable damage for which monetary damages alone

would be inadequate compensation" so that the Company will be

entitled to "an injunction and other equitable relief . . . in

the event of any breach or threatened breach . . . of the

provisions of this Agreement." (Id. ¶ 15.) Defendants Bethell,

Bussanich, and Bowman agreed to consent to the granting of

injunctive relief if they breached their Non-Competes. (Id.)

Bethell formed GNAC, LLC, a Delaware limited liability

company, on July 15, 2013. Bethell is the sole member.

Bussanich became a principal in GNAC after his termination from

Green Ballast. (Bussanich Decl. ¶ 2, ECF No. 8-2.) Bowman

joined GNAC after his resignation from Green Ballast.

Before his termination, Bethell asserted that ownership of

the Gemini Note controlled Green Ballast. (6/22/13 Bethell

Email, Exh. 60.)  On July 12, 2013, after his termination as an officer of Green Ballast, but while a member of its Board of Directors, Bethell issued a Press Release announcing the formation of GNAC.  (GNAC Press Rel., Exh. 8.)  GNAC's purpose was to acquire the Gemini Note.  (Id.)  The Press Release disclosed financial information about Green Ballast's ability to pay its debts.  (Id.)  It was issued before the Securities and Exchange Commission published second quarter financial reports. Defendant Bethell represented that a change in Green Ballast's management was needed because of the performance of the company's stock.  (Id.)

Defendant Bussanich discussed GNAC's desire to acquire the Gemini Note with Steve Winters of Gemini Strategies, the note holder.  (7/14/13 Bussanich Email, Exh. 2.)  Bussanich represented that Green Ballast needed a change of leadership. (Id.)  Bussanich was employed by Green Ballast at the time. Defendant Bethell told Steve Winters of Gemini that Bethell agreed with Bussanich's July 14, 2013 email.  (7/15/2013 Bethell Email, Exh. 1.)  Gemini did not sell the Gemini Note to GNAC.

Comforto was a contractor with and vendor for Green Ballast.  He represented himself as a "lighting specialist" with Green Ballast.  (Comforto Bus. Card, Exh. 9.)  Comforto became a principal in GNAC in July 2013.  (Comforto Decl. ¶ 3, ECF No. 8-1.)  Comforto obtained a quote for lighting supplies from

Contractor Lighting Supply, a lighting supplier, in July 2013. (Comforto Quote, Exh. 6.) Comforto sent that quote to Bethell. (Id.)

Defendants plan to sell variable speed drives and power correction amplifiers. Both products would be used by commercial buildings to reduce their energy consumption.

Bethell has filed an arbitration claim against Green Ballast with the American Arbitration Association. Bethell claims that Green Ballast fraudulently induced him to enter into the Employment Agreement and breached the Agreement when it did not pay him his earned but unpaid Base Salary under Section 6. (AAA Compl., ECF No. 8-3; Bethell Agr. § 6, Exh. 14.)

## III. Conclusions of Law[4]

### A. The Employment Contract

Green Ballast argues that Defendants Bethell, Bussanich, and Bowman's Employment Agreements, Non-Competes, and Non-Disclosures should be read as separate, complete documents. Defendants argue that the Employment Agreements incorporate the Non-Competes and Non-Disclosures by reference to create one document.

Tennessee law reads non-competition and non-disclosure agreements in pari materia with the employment agreement to

---

[4] All legal conclusions and the analysis based on those conclusions pertain only to the Motion for Preliminary Injunction.

which they are attached if "an executed agreement refers to other documents and makes the conditions of the other documents part of the executed agreement . . . ." <u>Burns v. Temperature Control Co.</u>, 371 S.W.2d 804, 806 (Tenn. 1963) (internal citations omitted). The subcontractor agreement at issue in <u>Burns</u> provided that the "Subcontractor . . . shall comply with all provisions of the Contract documents, specifications and drawings . . . ." <u>Id.</u> The "contract documents" included the "Rules and Regulations and Interpretations of the Prevailing Wage Scale Law." <u>Id.</u> The court in <u>Burns</u> held that the subcontractor agreement incorporated the provisions of the contract documents, including the "Rules and Regulations."

In <u>Hardeman Cnty. Bank v. Stallings</u>, 917 S.W.2d 695 (Tenn. App. 1995), a lease contract included a separate document incorporated through a clause guaranteeing "(1) the obligations of the Hardeman County Railroad Company, Inc. contained in the Lease to make payments of Basic Rent, Additional Rent, and All Unpaid Installments of Rent, as such terms are defined in the Lease and (2) the obligations of Hardeman County Railroad Company, Inc. contained in the Guaranty Agreement . . . ." <u>Id.</u> at 697-98. The court held that the phrase "contained in" incorporated the terms of the underlying documents into the lease. <u>Id.</u> at 699.

"When the terms of a written instrument are unambiguous, the interpretation of a contract is a matter of law for the Court, and it is the Court's duty to enforce the contract according to its plain terms." Whitehaven Comty Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn. 1998). "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." Ray Bell Constr. Co. v. State, 356 S.W.3d 384, 387 (Tenn. 2011).

The Employment Agreements in this case do not incorporate the Non-Competes and Non-Disclosures. Defendants Bethell, Bussanich, and Bowman's Employment Agreements reference the Non-Competes and Non-Disclosures in two places. In Paragraph 1, the Employment Agreements state that the Confidentiality Agreement "means that certain Non-Disclosure and Proprietary Rights Agreement between the Company and the [employee] in substantially the form attached hereto as Exhibit A." (Bethell Agr. at 2; Bussanich Agr. at 2). The Employment Agreements provide that the Non-Compete Agreement "means that certain Non-Compete Agreement between the Company and the [employee] in substantially the form attached hereto as Exhibit B." (Id.) The phrase "in substantially the form attached" is unambiguous. It does not incorporate any terms of the Non-Competes or Non-Disclosures. Exhibits A and B are offered as examples that do not necessarily contain the final terms of either agreement.

In paragraph 12, the Employment Agreement provides that:

> The [employee] shall enter into the Confidentiality Agreement and Non-Compete Agreement. The [employee's] execution of those agreements is a material inducement for the Company to enter into this Agreement. Therefore, this Agreement will be null and void unless the Executive enters the Confidentiality Agreement and the Non-Compete Agreement.

(Bethell Agr. ¶ 12, Exh. 14; Bussanich Agr. ¶ 12, Exh. 16.)

That provision is unambiguous. The Employment Agreement acknowledges the employees' execution of non-compete and non-disclosure agreements as a condition precedent to employment. It does not incorporate the prototype agreements. It does not use the phrase "contained in" to adopt the terms of those agreements.

## B. The Applicability of Defendant Bussanich's Non-Compete and Non-Disclosure Agreements

Defendant Bussanich argues that the term of his Non-Compete and Non-Disclosure expired on March 31, 2013, one year after his Employment Agreement expired. Green Ballast contends that Defendant Bussanich's Non-Compete and Non-Disclosure remain in effect because Green Ballast did not terminate his employment until July 23, 2013.

Bussanich's Employment Agreement provides that "the term of the [employee's] employment shall commence on the Effective Date [June 23, 2011] for the purposes of this Agreement and end on

March 31, 2011 . . . . (Bussanich Agr. ¶ 3a, Exh. 16.)[5] Green Ballast did not renew Bussanich's Employment Agreement in 2012. Bussanich was an at-will employee of Green Ballast until he was terminated on July 23, 2013.

Bussanich relies on B&L Corp. v. Thomas & Thorngren, Inc., 917 S.W.2d 674 (Tenn. App. 1995). In B&L Corp., an employee had a three-year employment term. Id. at 676. The employee's non-compete agreement remained in effect "during the term of his employment by the Corporation and for a period of (3) three years after the termination of said employment." Id. The court held the non-compete's reference to the "term of his employment" and to "said employment" meant the three-year period of non-competition began when the three-year employment term expired. Id. at 678.

In Corporate Express Office Prods., Inc. v. Warren et. al., 2002 WL 1901902 (W.D. Tenn. 2002), a non-competition agreement's stated term was "the greater of (i) the remaining term of the Agreement . . . or (ii) a period of two years after termination of his employment with Corporate Express." Id. at *17. The employee was terminated three months after his term of employment had expired. Id. The court held that the non-compete began to run when the employee was terminated, not when his employment agreement expired. Id.

---

[5] Supra note 2.

Although Bussanich's Employment Agreement contains an expiration date, that date does not define Bussanich's employment for the purposes of his Non-Compete and Non-Disclosure. Bussanich's Non-Compete and Non-Disclosure state that they apply "for a period of one (1) year after the date his . . . employment with the Company ends for any reason . . . ." (Bussanich Non-Comp. ¶ 2; Bussanich Non-Discl. ¶ 12.)

Green Ballast terminated Bussanich on July 23, 2013. (Bussanich Term. Letter, Exh. 30.) Bussanich's Non-Compete and Non-Disclosure began to run on July 23, 2013, and will expire on July 23, 2014.

### C. Green Ballast's Breach of Contract Claims Against Defendants Bethell, Bussanich, and Bowman

Defendant Bethell has filed a complaint in arbitration with the American Arbitration Association. "[I]n a dispute subject to mandatory arbitration under the Federal Arbitration Act, a district court has subject matter jurisdiction under § 3 of the Act to grant preliminary injunctive relief . . . ." Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1380 (6th Cir. 1995).

Bethell's arbitration claims are based, among other things, on his argument that Green Ballast materially breached his Employment Agreement when it did not pay him his earned but unpaid Base Salary under Section 6 of the Agreement. Bethell

alleges that Green Ballast's breach excuses performance of his Non-Compete and Non-Disclosure.

Bethell asserts that the Court need not decide the question of material breach because he will consent to entry of a preliminary injunction against him providing that:

> Until further order of this court or June 27, 2014 whichever occurs earlier, Bethell will not, directly or indirectly, participate in the management, operation, financing or control of, or be employed by or consult for or otherwise render services to, any Conflicting Organization in the United States in connection with or relating to lighting ballasts and fluorescent lighting fixtures.

With the exception of the insertion of "lighting ballasts and fluorescent lighting fixtures" instead of "Conflicting Product," that language is the same as the language in Paragraph 2 of Bethell, Bussanich, and Bowman's Non-Competes. (Bethell Non-Comp. ¶ 2, Exh. 45; Bussanich Non-Comp. ¶ 2, Exh. 44; Bowman Non-Comp. ¶ 2, Exh. 46.)

### 1. Defendants' Breach of their Non-Compete Agreements

#### a. The Definition of Conflicting Product

Green Ballast argues that energy conservation measures, including variable speed drives and power correction amplifiers, are "Conflicting Products" as defined in Defendants Bethell, Bussanich, and Bowman's Non-Competes. Defendants argue that "Conflicting Product" does not include all energy conservation measures and encompasses no more than lighting ballasts.

Green Ballast sells daylight harvesting ballasts. (Green Ball. Prop. Findings at 4, ECF No. 32; Def. Prop. Findings ¶ 28.) Green Ballast is also developing a wireless programmable ballast. (3/31/13 10-Q Item 2, Exh. 27.) Green Ballast claims a daylight harvesting ballast is an energy conservation measure ("ECM"). (Green Ball. Prop. Findings at 5.) An ECM is a product that "reduce[s] electric consumption off the National Grid" for commercial buildings. (Bethell Decl. at 2, ECF No. 8.)

Green Ballast's March 31, 2013 Form 10-Q states that Green Ballast's products "conserve energy and can greatly reduce the energy costs of operating commercial buildings." (3/31/13 10-Q Item 2.) Defendant Bethell signed that Form. (Id. at 16.) Green Ballast's "Energy Management Investment Opportunity" document markets its daylight harvesting ballast as a solution to the problem of demand on the national grid. (Green Ball. Inv. Opp. at 1, Exh. 18.) Defendant Bussanich also described Green Ballast's "daylight harvesting ballast" as an ECM. (7/14/13 Bussanich Email, Exh. 2.)

Defendants Bethell, Bussanich, Bowman, and GNAC wish to sell variable speed drives and power correction amplifiers. (Green Ball. Prop. Findings at 14-15; Bethell Decl. at 4; ECF No. 8.) Those products are not used in lighting. (Var. Speed Drives, Exh. 37; EE800 Power Opt. Series, Exh. 40.) Both would

be used by commercial buildings to reduce their energy consumption.

The purpose of Green Ballast's daylight harvesting ballast is to conserve energy and reduce the demand on the national grid. Variable speed drives and power correction amplifiers have the same purpose.

It is undisputed that Green Ballast is an "energy services company" ("ESCO"). (Green Ball. Prop. Findings at 4; Def. Prop. Findings ¶ 30; 05/11/13 Bethell Email, Exh. 13; 11/24/12 Bethell Email, Exh. 55.) Defendants argue that the scope of those services relates solely to installing Green Ballast's daylight harvesting ballast. (Def. Prop. Findings ¶ 30.)

The Non-Competes define "Conflicting Product" very broadly. A Conflicting Product includes products and services that are "the same or similar to, perform any of the same or similar functions as, may be substituted for, or are intended or used for any of the same purposes as, a Company Product." (Bethell Non-Comp. ¶ 1(b).) A "Company Product" includes both the daylight harvesting ballast, the programmable ballast, and Green Ballast's ESCO services. Green Ballast's products and services and Defendants' proposed products have the same purpose. Defendants wish to sell a product that competes with Green Ballast's products.

**b. Enforcement of Defendants' Non-Competes**

In Tennessee, covenants restricting competition are disfavored, but will be enforced if reasonable under the circumstances. Hasty v. Rent-A-Driver, 671 S.W.2d 471, 472 (Tenn. 1984). Factors to be considered in determining reasonableness include "the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant would be inimical to the public interest." Allright Auto Parks, Inc. v. Berry, 409 S.W.2d 361, 363 (Tenn. 1966). Although an employer "cannot by contract restrain ordinary competition," an agreement will be enforced if, without the covenant, "the employee would gain an unfair advantage in future competition with the employer." Hasty, 671 S.W.2d at 473. "Any competition by a former employee may well injure the business of an employer, [but] [a]n employer cannot by contract restrain ordinary competition." Murfreesboro Medical Clinic, P.A. v. Udom, 2004 WL 193049, at *3 (Tenn. Ct. App. Jan 30, 2004). Defendants do not challenge the consideration supporting the Non-Competes or argue that enforcement of the Non-Competes is not in the public interest. (Def. Prop. Findings ¶¶ 31-32.)

Green Ballast argues that it has a legitimate business interest in enforcing Defendants' Non-Competes and Non-

Disclosures. Defendants argue that their business would engage in ordinary competition with Green Ballast.

The threatened danger to Green Ballast is beyond ordinary competition. Unfair competition can occur if an exiting employee receives specialized training from the former employer, is given access to business secrets or other confidential information, or the former employer's customers tend to associate the employee with the employer's business because of the employee's contact with customers on behalf of the former employer. <u>Vantage Tech., LLC. v. Cross</u>, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999).

Defendants wish to sell products that compete with Green Ballast's products within the meaning of the Non-Competes. Defendants Bethell, Bussanich, and Bowman were Green Ballast executives. They obtained confidential financial information and business secrets. (<u>e.g.,</u> GNAC Press Rel. Exh. 8; 5/11/13 Bethell Email, Exh. 13.) Defendants Bethell and Bussanich represented Green Ballast to customers in the New York area. Based on that interaction, a customer would tend to associate Bethell and Bussanich with Green Ballast. Enforcement of Defendants' Non-Competes is appropriate on this record.

    **2. Defendants' Breach of Paragraph 12 of their Non-Disclosures**

Defendants Bethell and Bowman have consented to the entry of a preliminary injunction incorporating the restrictions in Paragraph 12, the Non-Solicitation Clause, of their Non-Disclosures. (Def. Prop. Findings ¶¶ 19, 54-55.) That language is essentially the same as the relief sought by Green Ballast in Section 5 of Green Ballast's proposed preliminary injunction. (Green Ball. Prop. Findings at 35, ECF No. 32.) It includes suppliers, manufacturers, service providers, and other business relations of Green Ballast. Defendant Bussanich has not consented to the entry of such a preliminary injunction because he believes the prohibitions of his Non-Disclosure no longer apply. They apply.

### 3. Defendants Bethell, Bussanich, and Bowman's Breach of Paragraphs 2 and 4 of their Non-Disclosures

Green Ballast alleges that Defendants Bethell and Bussanich breached their Non-Disclosures by disclosing confidential information about Green Ballast's finances, management, methods of doing business, business relations, pricing, and customers to third parties. Defendants deny this.

"Confidential Information" includes information about Green Ballast's operations, methods of doing business, markets, financial forecasts, finances, customers, the know how and compensation of other Green Ballast employees, and business strategies, among others. (Bethell Non-Disclosure ¶ 2;

Bussanich Non-Disclosure ¶ 2; Bowman Non-Disclosure ¶ 2.)  That information is confidential if it is "not reasonably knowable by the Company's competitors or by the general public through lawful means."  (Id.)

Defendant Bethell's Press Release about GNAC's formation disclosed confidential financial information about Green Ballast's ability to pay its debts.

In an email to Steve Winters, Defendant Bussanich discusses Green Ballast's markets in the New York area, compensation of other employees, business relations, and the conduct of Green Ballast's management.  (7/14/13 Bussanich Email, Exh. 2.)  That email also expresses Bussanich's opinion that the shareholders would not reap the rewards of his work in the New York area if management did not change.  (Id.)  The email discloses confidential information about the way Green Ballast does business.

Green Ballast has not alleged any facts about Bowman's breach of his Non-Disclosure.  The Court cannot conclude Defendant Bowman disclosed any of Green Ballast's confidential information.

### D. Green Ballast's Claims Against Defendants for Tortious Interference with Green Ballast's Business Relationships

Green Ballast alleges that Defendant Comforto, acting as the agent of Defendants Bethell, Bussanich, Bowman, and GNAC,

interfered with Green Ballast's business opportunity with RXR, a prospective client of Green Ballast. Green Ballast has alleged that Defendant Comforto stopped communicating with Green Ballast after obtaining a rebate for Green Ballast products. Green Ballast has alleged that RXR was also unreachable after the rebate was secured. Green Ballast alleges that Defendant Comforto contacted Defendant Bethell during this time about new opportunities. Green Ballast argues that those facts show Defendant Comforto, acting as an agent for the other Defendants, used improper means to take RXR's business from Green Ballast. Defendants argue that RXR was Comforto's client before he worked for Green Ballast and Comforto did not take RXR from Green Ballast.

To recover on this claim, Green Ballast must show:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference.

Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002) (internal citations omitted). A plaintiff can prove "improper means" by demonstrating a defendant's illegal or tortious acts, violence, threats, intimidation, bribery,

unfounded litigation, fraud, misrepresentation, deceit, defamation, duress, undue influence, misuse of inside confidential information, breach of fiduciary relationship, violations of an established standard of trade or profession, or unethical conduct. Id. at 701. n.5.

Defendant Comforto sold Green Ballast products. Green Ballast has specifically identified one customer, RXR, with which it had a relationship through Defendant Comforto. On this record, Comforto did not cause RXR to stop communication with Green Ballast. There is no evidence Comforto had an improper motive or used improper means to cause any lack of communication. Defendants Bethell, Bussanich, and Bowman did not induce Comforto to interfere with the relationship between Green Ballast and RXR.

**E. Green Ballast's Claims for Tortious Interference with Green Ballast Contracts**

Green Ballast alleges that Defendants Bethell and GNAC interfered with the contractual relations between Green Ballast and Defendants Bussanich, Bowman, and Comforto. Defendants argue that Defendants Bussanich and Bowman had personal reasons for leaving Green Ballast unrelated to any contact with Bethell. Defendant Comforto alleges that he never had a contract with Green Ballast and did not like the proposed employment contract he received from Green Ballast.

To recover, Green Ballast must demonstrate that Defendants Bethell and GNAC "by inducement, persuasion, misrepresentation, or other means" induced or procured the breach or violation, refusal or failure to perform any lawful contract by any party. T.C.A. § 47-50-109. Green Ballast must also show a contract existed, Defendants knew a contract existed, Defendants intended to induce the breach, Defendants acted maliciously, the contract was breached, the breach was caused by Defendants, and Green Ballast was damaged by that breach. <u>Corporate Express</u>, 2002 WL 1901902, at * 13.

Bethell knew of the contracts Bussanich and Bowman had with Green Ballast. Bethell and GNAC discussed opportunities to sell ECMs with Defendant Bussanich. (7/15/13 Bethell Email, Exh. 1; 7/14/13 Bussanich Email, Exh. 2.) That demonstrates Bethell's motive to induce Bussanich to breach his contracts. Defendant Bussanich violated his Non-Compete and Non-Disclosure. That breach will damage Green Ballast. Green Ballast has not demonstrated that Bethell and GNAC induced Bowman to breach his contracts. Comforto had no contracts to breach.

**F. Green Ballast's Claims for Conspiracy Against Defendants**

Green Ballast alleges the Defendants engaged in a civil conspiracy to breach Defendants Bussanich and Bowman's contracts with Green Ballast, to breach Defendants Bethell and Bussanich's Non-Disclosures, and to interfere with Green Ballast's business

relationship with RXR.  The elements of a civil conspiracy claim

are:

> (1) a common design between two or more persons; (2)
> to accomplish by concerted action an unlawful purpose,
> or a lawful purpose by unlawful means, (3) an overt
> act in furtherance of the conspiracy, and (4)
> resulting injury.

Kincaid v. SouthTrust Bank, 221 S.W.3d 32, 38 (Tenn. Ct. App.

2006) (internal citation omitted).

"There can be no actionable claim of conspiracy where the

conspiratorial conduct alleged is essentially a single act by a

single corporation acting through its officers, directors,

employees, and other agents, each acting within the scope of his

[] employment."   Trau-Med, 71 S.W.3d at 703-04.   Defendant

Bethell is the sole member of GNAC, a limited liability company.

As a matter of Tennessee law, Bethell cannot conspire with GNAC

to tortiously interfere with Green Ballast's contracts with

Defendant Bussanich.

Defendants Bethell and Bussanich did not commit any overt

act to interfere with Green Ballast's contracts with Defendant

Bowman.

Defendants Bethell and Bussanich discussed their efforts to

urge Gemini to sell the Gemini Note to GNAC.   They committed

overt acts divulging confidential financial information to third

parties publicly and in emails.  (7/15/13 Bethell Email, Exh. 1;

7/14/13 Bussanich Email, Exh. 2.)  The communications were unlawful because they violated both of Defendants' Non-Disclosures.  The breach caused Green Ballast injury.

Defendants Bethell, Bussanich, Bowman, and/or GNAC did not work together to interfere with Green Ballast's relationship with RXR.

**G. Green Ballast's Claims for Breach of Fiduciary Duty and Duty of Loyalty Against Defendant Bethell**

Green Ballast argues that Defendant Bethell violated his fiduciary duty and duty of loyalty to Green Ballast while he was a director.  Green Ballast alleges that Defendant Bethell was a a director of Green Ballast when he tried to buy the Gemini Note, issued a Press Release critical of Green Ballast management, made misrepresentations to Green Ballast's Board of Directors, and interfered with Defendants Bussanich and Bowman's contracts with Green Ballast.  Defendants argue that Defendant Bethell's attempted acquisition of the Gemini Note was on behalf of shareholders for the benefit of Green Ballast.  Defendants argue that Bussanich and Bowman left Green Ballast of their own accord.  Defendants have admitted that Bethell was critical of Green Ballast management and that he did not disclose his attempt to acquire the Gemini Note to the Green Ballast Board of Directors.

Under Delaware law, officers and directors of corporations owe "fiduciary duties of care, loyalty and good faith to a corporation and its shareholders." Malone v. Brincat, 722 A.2d 5, 9 (Del. Supr. 1998). The duty of loyalty is "not limited to cases involving financial or other cognizable fiduciary conflict of interest," but also "encompasses cases where the fiduciary fails to act in good faith." Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006). A failure to act in good faith may be shown where a fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty . . . ." Id. at 369.

Bethell remained a director of Green Ballast until August 2013. In June 2013, Defendant Bethell represented that ownership of the Gemini Note "controls the company." In July 2013, Defendant Bethell agreed with Defendant Bussanich that the owner of the Gemini Note could "clean house" at Green Ballast. (7/15/13 Bethell Email, Exh. 1; 7/14/13 Bussanich Email, Exh. 2.) In July 2013, Defendant Bethell issued a Press Release discussing non-public, confidential financial information. That Press Release was also critical of Green Ballast's management. Defendant Bethell also interfered with Defendant Bussanich's

contracts with Green Ballast.  Bethell formed GNAC, which seeks to compete unfairly with Green Ballast.  All of those actions conflict with Bethell's duty of loyalty to Green Ballast.

## IV.  Preliminary Injunction Analysis

Green Ballast seeks a preliminary injunction to enjoin Defendants from doing business with each other, current or former employees, vendors or independent contractors of Green Ballast; from contacting, soliciting, diverting, appropriating or calling upon any current, former or future customer of Green Ballast for the purpose of providing building audit services or any energy conservation measures; from making any negative comments about Green Ballast to anyone other than their counsel; and from interfering with Green Ballast's relationships with any supplier, manufacturer, service provider or other business relation of Green Ballast.

### A. Preliminary Injunction Standard of Review

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 573 (6th Cir. 2002) (internal citation omitted).  A court deciding whether to grant a preliminary injunction considers (1) the likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not granted;

(3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the injunction advances the public interest. Jones v. Caruso, 569 F.3d 258, 270 (6th Cir. 2009).

A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive. In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985). All four factors are not prerequisites to issuing a preliminary injunction; the court need only balance them to come to its decision. Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000). No single factor is determinative as to the appropriateness of relief. DeLorean, 755 F.2d at 1229. "If injunctive relief is proper, it should be no broader than necessary to remedy the harm at issue." U.S. v. Miami Univ., 294 F.3d 797, 816 (6th Cir. 2002) (internal citation omitted).

**B. Likelihood of Success on the Merits**

To establish a likelihood of success on the merits, "a plaintiff must show more than a mere possibility of success." Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 402 (6th Cir. 1997). It is sufficient if the plaintiff has "raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." Id. That standard does not require a party "to prove his case in

full at a preliminary-injunction hearing." <u>University of Texas</u> <u>v. Camenisch</u>, 451 U.S. 390, 395 (1981).

1. **Green Ballast's Breach of Contract Claims Against Defendants Bethell, Bussanich, and Bowman**

a. **Breach of Non-Compete Agreements-Conflicting Product**

Green Ballast has shown a strong likelihood of success on the merits of its claim that Defendants Bethell, Bussanich, and Bowman breached their Non-Competes.

Green Ballast sells daylight harvesting ballasts and is developing a wireless programmable ballast. (3/31/13 10-Q Item 2, Exh. 27.) Those two products are energy conservation measures ("ECM"), because they are products that "reduce electric consumption off the National Grid" for commercial buildings.

Green Ballast's March 31, 2013 Form 10-Q claims its products "conserve energy and can greatly reduce the energy costs of operating commercial buildings." (3/31/13 10-Q Item 2.) Green Ballast has marketed and continues to market its daylight harvesting ballast as a solution to the problem of demand on the national grid. (Green Ball. Inv. Opp. at 1, Exh. 18.) Green Ballast is an "energy services company" ("ESCO").

Defendants Bethell, Bussanich, Bowman, and GNAC intend to sell variable speed drives and power correction amplifiers. Those products are ECMs. (Var. Speed Drives, Exh. 37; EE800

Power Opt. Series, Exh. 40.) Commercial buildings would use both products to reduce their energy consumption. The purpose of variable speed drives and power correction amplifiers is to conserve energy and reduce the demand on the national grid.

The Non-Competes define "Conflicting Product" very broadly. A Conflicting Product includes products and services that are "intended or used for any of the same purposes as, a Company Product." (Bethell Non-Comp. ¶ 1(b); Bussanich Non-Comp. ¶ 1(b); Bowman Non-Comp. ¶ 1(b).) A "Company Product" includes both the daylight harvesting ballast, the programmable ballast, and Green Ballast's ESCO services. Green Ballast's products and services and Defendants' proposed products and services have the same purpose.

Green Ballast has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation about whether Defendants' products are "Conflicting Products." Green Ballast has demonstrated a sufficiently strong likelihood of success on the merits as to Defendants Bethell, Bussanich, and Bowman's breach of their Non-Competes.

      **b. Breach of Non-Compete Agreements-Reasonableness of Defendants' Non-Competes**

In Tennessee, factors to be considered in determining the reasonableness of a non-competition agreement include "'the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant would be inimical to the public interest.'" Allright Auto Parks, Inc., 409 S.W.2d at 363. Although an employer "cannot by contract restrain ordinary competition," a non-competition covenant will be enforced if, without the covenant, "the employee would gain an unfair advantage in future competition with the employer." Hasty, 671 S.W.2d at 473. "Any competition by a former employee may well injure the business of an employee, [but] [a]n employer cannot by contract restrain ordinary competition." Id.

Defendants do not argue that there was no consideration supporting the Non-Competes or that enforcing the Non-Competes is not in the public interest. (Def. Prop. Findings ¶ 32.) The second and third factors weigh in favor of Green Ballast.

The Defendants do not argue that the geographic restriction on Defendants' competition or the duration of the Non-Competes is unreasonable. (Def. Prop. Findings ¶ 23.)

The threatened danger to Green Ballast is beyond ordinary competition. Defendants wish to sell a product that competes

with Green Ballast's products.  Defendants Bethell, Bussanich, and Bowman were key Green Ballast executives.  Defendant Bowman developed Green Ballast's products.  Defendants know confidential financial information and Green Ballast's business secrets, including the Green Ballast playbook.  (GNAC Press Rel. Exh. 8;  5/11/13 Bethell Email, Exh. 13.)

Green Ballast is headquartered in Memphis, Tennessee. Defendants Bethell and Bussanich operated in New York and New Jersey.  They were generally Green Ballast's sole contact point with customers in those states.  That would create the impression with customers that they were the face of Green Ballast.

Green Ballast has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation about whether Defendants Bethell, Bussanich, Bowman, and GNAC unfairly compete with Green Ballast.  Green Ballast has demonstrated a sufficiently strong likelihood of success on the merits as to Defendants Bethell, Bussanich, and Bowman's breach of their Non-Competes.

2. **Defendants' Breach of Paragraph 12 of their Non-Disclosures**

Defendants Bethell and Bowman have consented to the entry of a preliminary injunction incorporating the restrictions in

38

Paragraph 12, the Non-Solicitation clause, of their Non-Disclosures. The Court accepts that language as to suppliers, manufacturers, service providers, or other business relations of Green Ballast. Because Defendant Bussanich's Non-Disclosure is still in effect, the preliminary injunction should be extended to Defendant Bussanich.

3. **Defendants Bethell and Bussanich's Breach of Paragraphs 2 and 4 of their Non-Disclosures**

Green Ballast has demonstrated a strong likelihood of success on the merits of its claims for breach of Defendants Bethell and Bussanich's Non-Disclosures. "Confidential Information" includes information about Green Ballast's operations, methods of doing business, markets, financial forecasts, finances, customers, the skill, knowledge, and compensation of other Green Ballast employees, and business strategies.

Defendant Bethell's Press Release about the formation of Defendant GNAC disclosed financial information about Green Ballast's ability to pay its debts. (GNAC Press Rel., Exh. 8.) That information was not public.

In an email to Steve Winters of Gemini Strategies, Defendant Bussanich discussed Green Ballast's markets, customers, the compensation of other Green Ballast employees, and Green Ballast's business relations and management

relationships. (7/14/13 Bussanich Email, Exh. 2.) That email discloses confidential information about the way Green Ballast does business.

Green Ballast has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation about whether Defendants Bethell and Bussanich breached their Non-Disclosures. Green Ballast has demonstrated a sufficiently strong likelihood of success on the merits as to Defendants Bethell and Bussanich's breach of their Non-Disclosures.

4. **Defendant Bowman's Breach of Paragraphs 2 and 4 of his Non-Disclosure**

Green Ballast has not alleged any facts about Bowman's breach of his Non-Disclosure. Green Ballast has not raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation concerning whether Defendant Bowman breached his Non-Disclosure. Green Ballast has not demonstrated a sufficiently strong likelihood of success on the merits as to Defendant Bowman's breach of his Non-Disclosure.

5. **Green Ballast's Claims Against Defendants for Tortious Interference with Green Ballast's Business Relationships**

To recover on this claim, Green Ballast must show:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference.

Trau-Med of America, Inc., 71 S.W.3d at 701 (internal citations omitted). A plaintiff can show "improper means" by demonstrating a defendant's illegal or tortious acts, violence, threats, intimidation, bribery, unfounded litigation, fraud, misrepresentation, deceit, defamation, duress, undue influence, misuse of inside confidential information, breach of fiduciary relationship, violations of an established standard of trade or profession, or unethical conduct. Id. at 701. n.5.

It is undisputed Defendant Comforto represented Green Ballast selling Green Ballast products. Green Ballast has specifically identified one customer, RXR, with which it had a relationship through Defendant Comforto. Defendant Comforto stopped communicating with Green Ballast after obtaining a rebate for Green Ballast products. RXR was also unreachable after the rebate was secured. Defendant Comforto contacted Defendant Bethell during this time about new opportunities. (7/22/13 Comforto Email, Exh. 6.) That evidence is not

sufficient to show that Comforto or Bethell intended to divert RXR's business from Green Ballast or used improper means to divert RXR from Green Ballast.

Despite the timing of these events, Green Ballast has not adduced facts raising questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation about Defendants' tortious interference with Green Ballast's business relationships. Green Ballast has not demonstrated a strong likelihood of success on the merits as to Defendants' interference with those relationships.

6. **Green Ballast's Claims for Tortious Interference with Green Ballast Contracts**

Green Ballast alleges that Defendants Bethell and GNAC interfered with the contractual relations between Green Ballast and Defendants Bussanich, Bowman, and Comforto. To recover, Green Ballast must demonstrate that Defendants Bethell and GNAC "by inducement, persuasion, misrepresentation, or other means" induced or procured the breach or violation, refusal or failure to perform any lawful contract by any party. T.C.A. § 47-50-109. Green Ballast must also show a contract existed, Defendants knew a contract existed, Defendants intended to induce the breach, Defendants acted maliciously, the contract was breached, the breach was caused by Defendants, and Green

Ballast was damaged by that breach.  Corporate Express, 2002 WL 1901902, at * 13.

Bethell discussed opportunities to sell ECMs with Defendant Bussanich.  (7/15/13 Bethell Email, Exh. 1; 7/14/13 Bussanich Email, Exh. 2.)  That would compete with Green Ballast's business.  Those conversations had an improper motive. Defendant Bethell was a member of Green Ballast's Board. Defendant Bussanich had a valid Non-Compete and Non-Disclosure at the time of the conversations, the same Non-Compete and Non-Disclosure Defendant Bethell had signed.  Defendant Bussanich has violated his Non-Compete and Non-Disclosure.  Defendant Bussanich stated that he would not stay at Green Ballast unless there was a change in management, like the one Defendant Bethell intended to engineer.  (7/14/13 Bussanich Email, Exh. 2.)

There is no evidence of any conversations between Defendants Bethell or Bussanich and Defendant Bowman.  Defendant Comforto never had a contract with Green Ballast.

Green Ballast has adduced facts raising questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation about Defendants' tortious interference with Green Ballast's contracts with Defendant Bussanich.  Green Ballast has demonstrated a sufficiently strong likelihood of

success on the merits as to Defendants' interference with those contracts.

Green Ballast has not adduced facts raising questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation about Defendants' tortious interference with Green Ballast's contracts with Defendant Bowman or its relations with Defendant Comforto. Green Ballast has not demonstrated a sufficiently strong likelihood of success on the merits as to that interference.

**7. Green Ballast's Claims for Conspiracy**

Green Ballast alleges that Defendants engaged in a civil conspiracy to breach Defendants Bussanich and Bowman's Non-Competes and Non-Disclosures with Green Ballast, to breach Defendants Bethell's Non-Disclosure, and to interfere with Green Ballast's business relationship with RXR. The elements of a civil conspiracy claim are:

> (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury.

Kincaid, 221 S.W.3d at 38 (internal citation omitted). The acts of representatives of a corporation in their representative

capacities on behalf of a corporation are attributed to the corporation. <u>Trau-Med</u>, 71 S.W.3d at 704.

Green Ballast has not adduced sufficient facts about Defendants Bethell and GNAC's conspired to breach Green Ballast's contracts with Defendant Bussanich. Bethell and GNAC cannot conspire as a matter of law. Green Ballast has not demonstrated a sufficiently strong likelihood of success on the merits as to Defendants' conspiracy to breach Green Ballast's contracts with Defendant Bussanich.

Green Ballast has not adduced sufficient facts about any overt act done to breach Green Ballast's contracts with Defendant Bowman. Thus, Green Ballast has not demonstrated a sufficiently strong likelihood of success on the merits as to Defendants' conspiracy to breach Green Ballast's contracts with Bowman.

Green Ballast has adduced facts raising questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation about Defendants Bethell and Bussanich's disclosure of confidential information to third parties. (7/15/13 Bethell Email, Exh. 1; 7/14/13 Bussanich Email, Exh. 2.) That disclosure was unlawful because it violated both Defendants' Non-Disclosures. The breach caused Green Ballast injury. Green Ballast has demonstrated a

sufficiently strong likelihood of success on the merits as to Defendants Bethell and Bussanich's conspiracy to divulge confidential Green Ballast information to third parties in breach of their Non-Disclosures.

Green Ballast has not demonstrated a sufficiently strong likelihood of success on the merits as to Defendants' conspiracy to interfere with Green Ballast's business relationship with RXR.

**8. Green Ballast's Claims for Breach of Fiduciary Duty and Duty of Loyalty Against Defendant Bethell**

Green Ballast argues that Defendant Bethell violated his fiduciary duty and duty of loyalty to Green Ballast while he was a director. Defendant Bethell was a director of Green Ballast when he tried to buy the Gemini Note, issued a Press Release disclosing information and critical of Green Ballast management, and interfered with Defendant Bussanich's contracts with Green Ballast.

In June 2013, Defendant Bethell was a director of Green Ballast. He represented that ownership of the Gemini Note "controls the company." (My Thinking, Exh. 60.) In July 2013, while still a director, Defendant Bethell agreed with Defendant Bussanich that the owner of the Gemini Note could "clean house" at Green Ballast. (7/15/13 Bethell Email, Exh. 1; 7/14/13 Bussanich Email, Exh. 2.) In July 2013, Defendant Bethell

issued a Press Release discussing non-public, confidential financial information. (Press Rel., Exh. 8.) That Press Release was also critical of Green Ballast's management. (Id.) While he was a director, Bethell formed GNAC, which seeks to compete with Green Ballast. Defendant Bethell interfered with Defendant Bussanich's contracts.

All of those actions raise questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation about Defendant Bethell's breach of his fiduciary duty of loyalty. Green Ballast has shown a sufficiently strong likelihood of success on the merits of its claim for breach of fiduciary duty and the duty of loyalty against Defendant Bethell.

### C. Irreparable Harm

"An injury is irreparable if it cannot be undone through monetary remedies." Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1382 (6th Cir. 1995) (citation and internal quotation marks omitted). Generally, there is no irreparable harm when monetary damages can compensate adequately for the asserted harm. When, however, there is a potential economic loss so great as to threaten the existence of the movant's business, an injunction may be appropriate. Performance, 52 F.3d at 1382.

Under Tennessee law, the breach of a covenant not to compete can cause irreparable damage. See Medical Educ. Assistance Corp. v. State ex. Rel. East Tennessee State Univ. Quillen Coll. of Med., 19 S.W.3d 803, 815-16 (Tenn. Ct. App. 1999). "The loss of customer goodwill and injuries that are a consequence of unfair competition are difficult to compute and certainly constitute irreparable harm." AmericaGas Propane v. Cook, 844 F.Supp. 379, 390 (M.D. Tenn. 1993).

Defendants have agreed that the breach of their Non-Competes and Non-Disclosures would constitute an irreparable injury. (Bethell Non-Compete ¶ 5; Bethell Non-Disclosure ¶ 15; Bussanich Non-Compete ¶ 5; Bussanich Non-Disclosure ¶ 15; Bussanich Non-Compete ¶ 5; Bethell Non-Disclosure ¶ 15.) The products the Defendants intend to sell compete with Green Ballast's products. Defendants' competition would be unfair given their possession of confidential information about Green Ballast and given Bethell and Bussanich's position as the face of the company in New York and New Jersey, where they intend to conduct GNAC's business.

### D. Substantial Harm to Others

The third factor requires consideration of the harm that granting the injunction would cause to others. Jones, 569 F.3d at 270. Determinations of substantial harm "require[] a court to balance the harm a plaintiff would suffer if its request for a

48

preliminary injunction was denied with the harm the defendants would suffer if they were to be preliminarily enjoined." Int'l Sec. Mgmt. Group, Inc. v. Sawyer, 2006 WL 1638537, at *8 (M.D. Tenn. June 6, 2006). The potential for harm "must be actual and imminent, and not merely remote or speculative." Romantics v. Activision Publ'g, Inc., 532 F. Supp. 2d 884, 890 (E.D. Mich. 2008)(citations omitted).

An injunction would only bar Defendants from "doing what [they have] already agreed not to do." See Leaf Funding, Inc. v. Butera, 2006 WL 2868976, at *11 (M.D. Tenn. Oct. 5, 2006) (finding no harm to defendants because a temporary restraining order would "merely prohibit them from violating the [agreement].") Green Ballast stands to lose customer relationships if the there is no injunction, which outweighs the potential harm to Defendants. See Corporate Express, 2002 WL 1901902 at *27. ("Corporate Express stands to lose its investment in the development of customer relationships while Defendants will lose that which does not belong to them, notably the advantages . . . available [because] of their employment with Corporate Express.") There is no evidence that any third parties would be harmed by the issuance of a preliminary injunction.

**E. The Public Interest**

The fourth factor in determining whether to grant a preliminary injunction is whether the public interest would be advanced. <u>Jones</u>, 569 F.3d at 270. "Judicial enforcement of a noncompetition provision in an employment contract generally serves the public interest by promoting stability and certainty in business and employment relationships." <u>Corporate Express</u>, 2002 WL 1901902, at *28. "Companies [] have a legitimate public interest in keeping certain information confidential and in maintaining their clientele, and Tennessee has recognized that businesses have the right to protect their confidential and trade secret information . . . ." <u>Sawyer</u>, 2006 WL 1638537, at *10.

## V. Conclusion

Green Ballast is likely to succeed on the merits of its claims relevant to the injunctive relief which it seeks. Green Ballast will suffer irreparable harm without an injunction. The balance of harm between Green Ballast and the Defendants favors the issuance of an injunction. An injunction is in the public interest.

### PRELIMINARY INJUNCTION

1. Defendants Bethell, Bussanich, Bowman, and GNAC are enjoined from doing business with current or former employees, vendors, or independent contractors of Green Ballast.

2. Defendants Bethell, Bussanich, Bowman, and GNAC are enjoined from contacting, soliciting, diverting, appropriating, calling upon, or doing business with any current, former or future customer of Green Ballast for the purpose of providing energy conservation measures used in commercial buildings.

3. Defendants Bethell, Bussanich, and Bowman are enjoined from disclosing confidential information about Green Ballast. Confidential information is information that relates to Green Ballast's existing or potential business that is not reasonably knowable by their competitors or the public through lawful means. That includes information about Green Ballast's research and development efforts, plans for products and services, customers, suppliers, service providers, manufacturers, business strategies, marketing plans, finances, and employees.

4. Defendants Bethell, Bussanich, Bowman, and GNAC are enjoined from interfering with Green Ballast's relationships with any supplier, manufacturer, service provider or other business relation of Green Ballast.

This Preliminary Injunction shall expire upon completion of a trial on the merits.

**Bond**

Green Ballast asks that no bond be required in this case. Defendants seek additional time to address the necessity of a bond.  Both parties have 7 days from the entry of this order to brief the issue of an appropriate bond.  Both parties have 5 days after those briefs have been submitted to respond.

### Scheduling Conference

This matter is set for a telephone scheduling conference on **Tuesday October 22, 2013 at 9:00 A.M.**

So ordered this 10th day of October, 2013.


s/Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE